Hope Houston's doing better. Wasn't that the reason for a delay? You okay? The case for argument this morning is 16-2565 SNF Holding v. BASF. Mr. Dowdy. I reserve five minutes. Chief Judge Prost and may it please the court. The board in this case committed two errors that called for reversal. First, in its final written decision, the board for the first time announced a construction of the claimed invention that differed substantially from what the patent, the prosecution history, and the board's own institution decision had identified as the claimed invention. The 215 patent is directed to a different type of polymerization reaction than 329. Am I correct? It is, Your Honor. However, at the time of prosecution, that was exactly the point that the examiner made to distinguish the 215 patent from the claimed subject matter. Exactly that, that the gel in the 215 reactor vessel was an anhydrous gel as opposed to a hydrous gel. So the reason for allowance stated in the patent on page 701 of the joint appendix is the prior art shows a tapered reactor but not solution polymerization of AA acrylic acid, MAA methacrylic acid, or their esters. So is 215 then not relevant prior art? No, 215 is crucially relevant prior art because it shows what the state of the art was, number one. And more importantly, it contained a crucial admission on the part of the patent owner as to what was known in the art at the time. I think the best way to understand what was going on in this case is to turn to pages 17 and 18 of the board's decision, which is in the joint appendix. And with the court's permission, I have drawn a sketch of the figure that's on page 18 of the board's decision, which I think will aid the court in following along the argument. What the patent says in columns 1 and 2 is that before the claimed invention was made, it was known you had to use a tubular reactor having a conical taper, having an inlet for filling it with reactants, having a diameter ratio of between 2 to 1 and 10 to 1, having an inlet for gas injection, and in a mode of operation, quote, the plastic polymer matrix being discharged from the tubular reactor virtually without residue by injecting an inert gas. Well, I think turning to those pages, as I understood what the board was saying was that the reason this is not helpful to you or as helpful as you might like is that they've got that number 6 there, which is the discharge aid. So that this is another factor, which is not present in the claims, and that's how the board differentiated the 215. So what's wrong with that? Your Honor. I mean, it says bottom of 18. Your Honor. There's an inert gas pressure and a discharge aid located, and the discharge aid is what they relied on as differentiating the two. There's two crucial points about that. First of all, the 215 patent was a reference that the patent owner's expert never mentioned in his expert report. At the time of the patent owner's… Well, show me a reference that expressly promotes a conical taper as being advantageous for any purpose relevant to the types of polymers claimed in 329. On page 501 of the joint appendix, column 3, line 70, there is a specific disclosure of a tubular reactor being used to make the very type… Hold on. You're going too fast. Okay. 501, column 3. 501, page 501. Column 3. Column 3. Line 70. Okay, the first example. There is a statement starting in line 70. The resulting gel-like polymer solution was discharged from the vessel through the outlet by the use of nitrogen gas pressure, and the description of the dimensions of that make it clear that the reactor vessel is cylindroconical. So to the extent that it was ever a requirement, which was never suggested in the patent, never suggested in the prosecution history, never suggested in the board's institution decision that the innovation here was not the substitution of a hydrous gel for an anhydrous gel in the reactor, but rather was injecting gas pressure for a length of time sufficient to bring the reactor vessel to a state of substantial emptiness. Okay, either I haven't asked the question right or you're not answering it, because it seems to me the basis upon which the board relied for differentiating the 215 is this number six thing, that it wasn't just, it used both inert gas pressure and a discharge aid. And then on 1819, they go on to say, indeed, the discharge aid tends to support the patent owner's argument that it wasn't the pressure alone that did it. So that's the basis upon which the board differentiated the 215. What is wrong with that? It's because that wasn't the patent owner's argument. The patent owner's argument is summed up on page 59, paper 20 of the Exhibit 2016 in the record. Okay, you're going to have to give me a better, what? Paper 20. It is in the record. It is not in the joint appendix. But what the patent owner said, quote, prior to the invention of the 329 patent, conical tapers and inert gas had never been used to remove polymer gels from reactors. And the other side's expert in Exhibit 2016 in the record, in paragraph 202, said, the prior art reflects that those who attempted to use inert gas to remove polymer gel from a reactor found it was not a viable option. When they responded to the petition, they took the position that this reference was not citable in an obviousness combination. And on page 10 of their brief, they make a crucial error. On page 10 of their brief to this court, they said, quote, while the 215 patent is prior art under 35 U.S.C. 102E, it is also a BASF invention and therefore not citable for purposes of an obviousness inquiry according to 35 U.S.C. 103C. Wrong. This patent issued in 1997. At that time, 103C did not cover 102E, 103 references. So what happened here is that all throughout the board proceeding, the patent owner took the position that this reference was not rightly considered by the board. Their expert didn't put in any evidence. What they did is they tried to impeach what their own patent said about the state of the art, what was known in the art, with general oral testimony by an expert who said this had never been done, that said use of conical tapers and inert gas had never been used to remove polymer gel. So the patent owner made this sweeping argument, which was based on error, that this wasn't rightly considered, an error repeated in their brief to this court. And so when we came back in and said, how can you possibly make this statement that conical tapers and inert gas had never been used to remove polymer gels from a reactor, the answer was their expert hadn't considered this. Can I ask, if this was prior art, why wasn't it one of the principal prior art references on which you based your challenge? Because the patent gave no inkling that what made this non-obvious was the idea of injecting gas pressure for long enough that the reactor achieves a state of substantial emptiness. What the patent identified as the innovation, what the examiner said was the innovation, was the monomer. This was old. They had used this exact process to make anhydrous gel intermediate. They said, our innovation here is not making just any high molecular weight polymer. This claims, every claim specifically resides making high molecular weight polymer using water-soluble, monoethylenically unsaturated monomers in aqueous solution. Was 103C cited below? I don't know that it was cited below. It was baked in to the patent owner's presentation. They submit an expert. I invite the court to read Exhibit 2016. That is the sole evidence. Well, look. No, no. I asked you a question. To my knowledge, it was not cited below. So you didn't discuss it below, that it didn't exist at the time. Until the final written decision, the board in its institution decision never bought the argument that this wasn't rightly considered. And then during the proceeding, the patent owner simply took the position that this wasn't rightly considered and had its expert didn't consider it. Let's talk about the claim construction of removing. We don't have a ton of time. Yes. Our position on that is very simple. No, no. I have a question for you. Okay. Thank you. On page 31 of the blue brief, you make your interpretation argument. And you say that removing has its ordinary meaning as discharging. And you say specifically removing describes an active process of removal, not one that has been completed. It's synonymous with discharging. Is that any amount, no matter how tiny? Removing as an operation begins when it begins. So the patent says ejecting, removing, discharging, pushing out. It's describing what is happening when the gas pressure is applied. So, for instance, in a continuous process, the reactor optimally is being filled. One percent enough to qualify as removing. If you perform that element for only five seconds, yes. Because removing is describing an operation. What is the machine doing at this point? It's polymerizing. Okay. What is the machine doing at this point? It is in the process of removing what's in the reactor. So if you think of removing the way the patent describes it as how are you getting it out? It's not with a piston. It's not with an auger. It's being pushed out by injection of inert gas. So if you leave the inert gas on for five seconds, not that much is going to come out. If you leave it on for three hours, a lot of it will come out. But this idea that patentability depends on how long you put the gas pressure on. So whether it's at some point you reach a state of substantial emptiness. That was never, prior to 2015, there was never any suggestion that any patentability depended on what length of time you put the gas pressure on. No, no, no. But what the board, I think, relied on is that the patent is chock full of examples. And you're right. Those examples don't, it's confusing because the examples use the word discharge and not removal. But what they say about discharge is discharging without residue. Yes, which is exactly what was in the prior art. The fact that gel doesn't stick to Teflon was not a new discovery in 1995. The patent 215 says if you want to get the gel out, you line it with Teflon. And optionally, you can include a displacement aid here so that the gas doesn't tunnel down through the center. But one of the glaring errors that the board made in analyzing this patent, because the patent owner didn't put any evidence in, and the board didn't accept the erroneous argument that it's not properly considered, is that they ignored the evidence of petitioner's expert, appearing in 1878 to 1882, that this shows the exact mode of operation as is claimed in the 329. And the board conflated and confused the displacement device, this item 5, with a discharge aid, which is an apparatus that's downstream of the reactor. They said the discharge aid was within the conical portion of the reactor. There's no testimony. What are we talking about? Where are we in the board's analysis? On page 18 and 19 of the board's decision, the last two lines on page 18, it says, given that the 215 discloses the use of both inert gas pressure and discharge aid located within the conical portion. Well, the thing that's located within the conical portion is the displacer 5. Displacer 5. The discharge aid is down here. And so that's just a glaring factual error, which a board can fall into when they're doing it all on their own. They're not relying on evidence submitted by the parties. They're doing this all on their own. And, by the way, the board said we're not going to credit this because the patent owner's combination doesn't include a discharge aid. Well, that is another factual error. Had we known that they were going to do that, which we didn't know in advance, we would have pointed out that the 597 patent, the second reference, is all about a downstream apparatus that is the same as the discharge aid. Okay. What are you talking about now? If you turn to page 501 again, 501, which is the page of the patent. If you look at, actually, if you turn to page 499. The 597. 597. Yes. If you look at page 499, 499 is a picture of an auger that is receiving the feed of gel from the polymerization reactor. And the whole point of this patent is to provide an apparatus that is the same as what the 215 patent refers to as a discharge aid. In this particular case, it is a horizontally mounted auger that applies negative pressure to what's coming in and pushes it out through what's something like a meat grinder to chop it up. It's the same function. So what was the specific column line material that you read from page 501? Line 70. Line 70. On column 3. Column 3 on page 501. It says the resulting gel-like polymer. I'm sorry. You're speaking too fast for me. I'm sorry. 597 patent. Yes. Page 501 of the joint appendix. Yes. Column 3, line what? 70. 70. 70. Thank you. The gel-like polymer. The. Not some. The gel-like polymer. And the last point I'd like to make before sitting down. Wait a minute. Can we just work that story a little more? That sentence. The resulting. What are you talking about? The resulting gel-like polymer. The suggestion is made. And, again, we had no notice. We had no APA notice that this was the claim convention, that this was anything we had. If half of the polymer was discharged, would that be the? Say that again? I said if half of it was discharged, would that be the? I would say not. Really? No. Well, I mean, the is a definite adjective. It's talking about a specific quantity, I would suggest. Oh. The means all, I would say, in this context, yes. That's what our experts said. The last point I'd like to make, if I could, is that the patents in this art, the 215 patent, the 329 patent, and this patent up at the top, that same column on page 501, you'll notice it says, also, tubular-shaped reactors are quite suitable for this purpose. The word tubular, in this art, is routinely used to describe tubular reactors that have varying diameters. So don't be misled into thinking that tubular, in this art, means a cylinder only. These reactors are all characterized as tubular, including the 329 patent itself. We're into your rebuttal. Thank you. We're interested to hear your views. Thank you. Thank you. May it please the court? Because the analysis set forth in Phillips strongly favored the substantially all construction, the PTAB reached the correct claim construction for the term removing in the 329 patent. And on the issue of claim construction, is removing, is the way to define removing, based on the examples, discharging without residue? Is that the same thing? It's not exactly the same thing, I believe, Your Honor. I think for removing, if you look to the teachings of the specification, what does the 329 patent teach us? When it uses the word discharge, there's always a qualifier with it. And the whole purpose— And the qualifier is? Is complete, discharge, or substantially complete in terms of the examples. Wait a minute. I mean, why—I think my question was, doesn't it use the word discharge without residue, and is that the sign is removed? Yes, the example— I'm looking at the examples, and you're talking about what it says about discharge, and the words used are discharge without residue. Are you disagreeing with me? No, in some cases it certainly does say discharge without residue, and in some cases in the examples, example 14 in particular, says discharge with insignificant residue. And at the very beginning of the patent, the way the problem set forth at this invention was aimed to solve was the problem of incomplete discharge. There's no dispute here that making certain polymers has been around for quite a long time. You can make them in a container. The problem is getting them out in a way that's useful and efficient. And the state of the art at the time, the solution at the time, was actually to use a piston and push this gel out. If you imagine Jell-O, the last thing you want to do when you want to get Jell-O out of a container is make the opening smaller. And so the prior art had two approaches to this. Have no constriction in the opening, leave it wide open, and let it fall out by its own weight. Or that. Or, no, or use a piston and press it out so that you get all of it out. The 215 patent is a very different situation. The 215 patent... Can I just ask, in column one of the patent that's at issue here, the 329 patent, there's a long middle paragraph about JPA 93-57181, a Japanese something, patent application, whatever. Doesn't that describe the use of inert gas to push polymer out of a reactor? So thank you for pointing that out. The JP181 reference is a piston reference, which uses a piston. And in that reference, what the inventors in JP181 said is that if you just use inert gas, there are problems. And those problems include the gas breaking through the side of the reactor in the gel and escaping, in which case the gel remains trapped in the reactor. So you can't get it out. This is the problem that the 329 was designed to address, not being able to get the gel out of the reactor. What about the Section 103C argument that your opposing counsel made? Did it not exist? So the 103C argument was never made in front of the PTAB board. And it was a mistake in the briefing, but I would submit it's an honest mistake because both attorneys in this case made the mistake. What mistake? How would you characterize the mistake? Are you relying on it at all? Is that what you're saying is the mistake? What is the mistake? The mistake is that 103C applying to 102E art, the effective date of that statute, both attorneys in this case in the IPR misunderstood the effective date of that 103C exception. So it was raised below. No, it was raised in the hearing. And the PTAB put the question to SNF's counsel, the exact question this panel has, why didn't you raise the 215 patent earlier or another piece of art that was subsequent to the 215, the 940? Why wasn't that raised in the petition? And SNF's counsel in front of the PTAB said, well, they could have easily sworn behind it because it was under 103C. I think this was a mistake. It was a mistake in our briefing. I'm not trying to hide from that. But it wasn't an issue raised before the PTAB, and it wasn't a basis for the PTAB's decision in any form. What was the ground of the board's treatment of the 597 prior art, starting with the claim construction that substantially all of the material has to be removed? What did it say about the 597? What the board said about the 597 is that neither the 597 taught the extent of removal from that reactor, neither of the primary references, the 944, nor the 597 taught how much gel was removed from the reactor. And that's a natural consequence. Well, let me just, I guess, tell you what connection is in my mind and then you can tell me why, clarify things for me. It may be for me the most important aspect of the claim construction of the pattern we have in front of us, that a definite article, the, follows the removal word. Not the removal word all by itself. The definite article suggests it's the entirety of the material that is being removed. Something different from the distinction between the word discharge and the word removal. Mr. Davide points out on column 3 of the 597 at line 70, that that piece of prior art also uses the word the, which leaves me wondering why it doesn't have the same meaning that in effect undergirds the claim construction of the patent at issue here. I think there's two parts to the answer. Number one, in the 597 patent, the example at column 3, line 70, is just that, an example. It's not a claim. That's not claim language where you look at the antecedents the same way and you give those antecedents particular weight. Why would that matter? It teaches everything that's in the document, including in that example, getting rid from the vessel of, let's say, the entirety of the material that was in the vessel. So first of all, the 597 never mentions that it's trying to get rid of all of the material. But if the word the has that fairly natural implication, and maybe you want to tell me that I'm reading too much into the word the and that the claim construction of the patent in front of us, the 329, doesn't really depend on that but rather depends on a sense from the spec as a whole of the definition of the problem. The problem that it was addressing was getting rid of all of it and now it's got something, it's got a solution to that. And so in the context of this patent, not particularly from the word remove, which I must say is not, to my mind, very distinct from the word discharge, but that when that word is being used in the context of this patent, it's not in reference simply to the action at any given moment, but in specific reference to the ultimate endpoint of the object of that word. If I understand, Your Honor, in the 597 patent, this example actually states the resulting gel-like polymer solution was discharged from the vessel. That's entirely consistent with the chemical engineering understanding of the word discharge being a passive phenomenon. You fill a reactor up, you want to drain it, let's say it has water, I want to discharge it, I open the valve and gravity discharges it. That's not an active step of making sure everything is out of the reactor. That's a fundamental distinction between even the plain meaning of discharge and removing. I guess I'm struggling with that. I don't want to interrupt your chain of thought, but all of the examples except for one, numerous examples in the 329 do not use the word remove. They use the word discharge without residue. You're right. In the examples they talk about, when they use the word discharge, there's always a qualifier with it. That's the point. When discharge is used, you have to qualify it because it's a passive action. So when you say discharge, do you mean just release some and residue is okay, or do you mean get it all out? So if you say discharge, you have to... Removal is equal to discharge without residue? Yes. Removal is the same thing as complete discharge. The plain dictionary definition, as the PTAB noted, for removal is to eliminate, to get rid of, whereas discharge can just be to pour out. Stuff can remain. That's what's important because that's the fundamental purpose of this invention was to address all these problems in the prior art of incomplete discharge. Well, going back to Judge Toronto's question then about line 70 of the 597 patent, the resulting solution was discharged. You're saying that's something less than without residue? It has to explicitly talk about without residue? Is that what we're talking about? Well, I think the problem with the 597 patent is it says nothing about the extent of discharge. This is a situation where because a reference says nothing, you could read into it as much or as little as you'd like because the purpose of the 597 patent was downstream processing, so it has no information about the extent of discharge. It has no information about the purpose of discharge other than getting it to the next step. What about the 215, which explicitly calls out discharged without residue by injecting inert gas? Why isn't that sufficient? Well, in the 215, if you take those words in isolation, but that's not the reference. The reference is about a thermoplastic material. First of all, it's not the same kind of polymer. It's a multistage reactor process where in those stages, gas pressure is used to move the material, and it's not purely a polymer gel in that it is intersposed within that thermoplastic are solid catalyst particles, and there what is discharging... But the board makes the argument about the differentiation being the number 6, the discharge. Did you make that argument? Yes, the discharge agent... You made that argument below to the board? Yes. Okay. That discharge age, as the board pointed out, was in the conical portion of the reactor. What the 215 patent teaches is that to discharge a material, you could have a discharge age in the conical portion of the reactor that can be either a piston, right, which is in the prior art, or a screw auger type thing where you can pull it down as a screw, pull the gel down. So the board noted that the 215 patent itself taught the use of a discharge age within the reactor. And that was a fundamental distinction. Isn't 6 the discharge age? Yes, but in the crude drawing, yes. But in the description, I mean, this is not a drawing that's to scale or is representative of the invention. It's just schematically showing features in a rough sense. What's the portion of the 215 that speaks of the discharge age inside the vessel as opposed to 6-7? I think at column 4, line 48. What page in the appendix? 1898. Appendix 1898. In there, about line 48 where the 215 patent in appendix 1898 states that the discharge age in the conical part of the reactor. I'm sorry, and what's the, I think I've a little bit lost the point of why we're talking about this. I think that actually is a good point because the 215 patent is not even a ground in the petition before the PTAB. The 215 is this background knowledge argument. Well, the way the board at least described it, it didn't describe the 215 as a freestanding piece of prior art, but rather it was interpreting the seven or eight lines at the bottom of column 1, top of column 2, 329 patent, which is an issue here, and asking what does that set of lines admit about the prior art. And it was interpreting that language and it started with language that doesn't actually refer to anything but the injection of inert gas and nevertheless saying, well, we're not quite sure what those words mean so we're going to look at the 215 prior art to understand the scope of the admission. And when we look at it, we see that the scope of the admission is not something that covers the current claim as construed because as we construe it, we construe it to mean what? Inert air only doing the complete, the effectively complete removal. That's part of it, but I think what the PTAB was saying was that you can't look at the 215 patent and learn from it that using a taper with inert gas would affect substantially complete discharge because the 215 patent was completely silent as to the benefit or function of a taper in terms of getting the substantially complete removal. So there was no teaching in the 215 patent that would allow you to connect any dots to the grounds at issue. And I should say the 597 patent at issue did not teach a conical taper. That's an extrapolation that the petitioner made below based on the sizes. Nowhere in the 597 patent is there a teaching of a conical taper. I don't remember the details, but was there a pair of diameters, one larger than the other? That's correct. I'm sorry. So what is not logically unavoidable when you have big diameter, small diameter vessel that it's not conical because it could be what? Because all the 597 patent teaches is that it has a bottom outlet. Bottom on the floor, bottom on the side is possible. It could be hemispherical. It could be flat. Those are all common shapes of reactors in chemical engineering. There's nothing in the 597 patent to specifically state that this is a conical reactor. In that 215, the item 5 in that chart is referred to as a displacement apparatus. I agree with you. It doesn't say that the discharge aid is not in the cone, in the conical section. But on the other hand, it does say that 5 may be installed at the lower conical end. But you're telling us that what's labeled 5 there is, in fact, the discharge aid. With respect, I'm not saying that. You pointed to it when you said it. No, I'm saying this area, the cone area. Okay. 5, this disruptor mechanism, if you think about it. I get what it is. Okay. So you're saying that 6 is actually somewhere in the cone. According to— From the description. It doesn't say it's not. It just doesn't say. Well, the description in the 215 patent actually lied in 48 on appendix 1898, column 4 of the 215 patent specifically says that the discharge aid is in the conical part of the reactor. Hang on. Yeah, you're right. So what I'm saying is that the 215 patent, what it teaches us, it teaches the location, and that is in the cone. So your opposing counsel is incorrect in that argument, in his analysis of that diagram. I believe so, as that's what the PTAB found as well. I see my time is up. Thank you. Thank you. It was worth being done. You weren't able to see the chart, but you followed what I was asking about. Yes, and— And how do you respond? Wait, wait. Don't talk. How do you respond to line 48 in column 4? Because what it's— Let me say, first of all, what we've been talking about here, there's only one person who interpreted this who was skilled in the art that was our expert. The question was raised, did they raise this before the board? The answer is they did not. Their expert did not address this at all because at that time, based on their erroneous, apparently, view of 103C, they took the position this wasn't relevant. So their expert did not address it at all. So the evidence on what this patent disclosure means— Can I read this? Yes. So getting to your point— Thank you. I think what that line is saying is that it's forced continuously toward the discharge aid in the conical part. That is to say, it's fully consistent with 6 correctly identifying the discharge aid is down here, and it's pushing it toward the discharge aid in the conical portion. Wait a minute. It's not—from what you're saying, it's not forced in the cylindrical part. Is that right? No, no, no, no, no, no. The inert gas is pushing down on the anhydrous gel. And it's saying it's pushing it through the conical portion toward the discharge aid. That's the way our expert interpreted that. So you read E&S through. No, toward the discharge aid in the conical part. In other words, you could say it's in the conical part is modifying forced continuously in the conical part towards the discharge aid. That's what our expert—that's how our expert interpreted that. And that's consistent with how the figures are labeled in the drawing. Now, counsel stood here and said that the word discharge is only used with modifier. Not so. The abstract of the patent says— this is on page A25 of the appendix— the abstract says, and discharge of the gelatinous reaction mixture from the reactor by injection of an inert gas. There again, the word discharge, ejecting, pushing out, removing, they're all describing an operation. And Judge Gerano, even if we don't think this is the correct construction, because in this patent the disclosure is optimally the gel is there at an average constant level. So for a continuous process, which this patent in column four says is an embodiment, a continuous process embodiment— Because they're ejecting the gel from the side. Before this oral argument, I'd never heard that— Never, I'm sorry. No, no, no, no. But the point is, if you interpret removing as more or less interchangeable with discharging, ejecting, pushing out as an action, which will go on for whatever length of time the machine system is causing that action to happen, well then, you describe both batch processing— Right, but let me just ask, what's your response to the following characterization of the spec? The spec says there's been a problem in the prior art. There are a variety of ways of getting stuff out. The inert gas way doesn't get it all out. We have a solution to that. So our claim really had better be about getting all of the stuff out. Because that's the problem that we can solve with inert gas. And we described in Column 1 how the prior art doesn't solve that problem. For water-soluble hydrous gels only. And that's what the examiner said. The Column 1, Column 2 says there's no problem getting it all out in the 215. This is an anhydrous gel. What we've done here, and the reason our claims are limited to the hydrous gel, is that was what they then said was their innovation, taking this and using this process for the hydrous gel polymer, like polyacrylamide, polyacrylate. And that's what the Statement of Reasons for Allowance said. It was only in the midst of litigation, when they were confronted with evidence, that that was not a new idea. This had been used for polyacrylamide, too, that they came up with this new theory that what the innovation here was not the idea of substituting a hydrous for an anhydrous monomer, but operating the system for long enough to achieve a state of substantial emptiness. And that is a strategy that makes sense in IPR because of the severe procedural constraints on the petitioner to try to respond to a new on-the-fly argument like that. But as Your Honor has pointed out, the word the is the Achilles' heel in that argument because the 597 patent very clearly, as our expert says, discloses discharge of substantially all, even under their construction. So in our view, the case clearly requires a remand because the proper interpretation of removing is as a present participle verb, an action, as opposed to an operating condition. And in the alternative, the Board's interpretation of this, now that we know that the whole patent owner presentation was based on an erroneous view of 103C, I think it's not accurate to say that this was not part of their presentation. It was built into their presentation, which is why this was never discussed by their expert. The Board should not have, on its own, allowed the patent owner one. Would the SNF argue below, as your opposing counsel says, that very point? There was a... One of the things... What very point? Your opposing counsel says that when the issue was raised by the Board, your counsel below said, well, they could just argue around it. Not true. 215 would be 102B prior art in any event. So that point is simply not true. It was another reference. It wasn't said. Not as to the 215. There was an error made as to something we haven't talked about at all here this morning, which was the 948 patent. But the 215 was always insisted upon and discussed at length in our expert submissions, 1878 to 1882 of the JA, that this is prior art, and this shows that their expert was wrong when he said, quote, this is Exhibit 2016, those who attempted to use inert gas to remove polymer gel from a reactor found that it was not a viable option. Their argument to the Board was not that this didn't work for hydrous gels, but that it didn't work at all. And that was untrue. And that was built on what we now have admitted on the record was an erroneous view of the law in which they erroneously didn't show this to their experts. So we thank very much the Court's attention and allowing me to go a little bit over. Thank you. We thank both sides. Thank you, Justice. That concludes our statements for today. All rise.